# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

|  |  |  |
|---|---|---|
| ROBERT DAMIEN ANDERSON, | ) | No. CV 12-5091-PLA |
|  | ) |  |
| Petitioner, | ) |  |
|  | ) | **MEMORANDUM DECISION AND ORDER** |
| v. | ) |  |
|  | ) |  |
| WARDEN, SVSP, A. HEDGPETH, | ) |  |
|  | ) |  |
| Respondent. | ) |  |
|  | ) |  |
| _____ | ) |  |

## I.

## SUMMARY OF PROCEEDINGS

On October 1, 2009, a Los Angeles County Superior Court jury convicted petitioner of one count of second degree murder and five counts of attempted murder. The jury also found that the attempted murders were committed willfully, deliberately, and with premeditation, but found the gang enhancements alleged as to all six counts to be "not true." (7 Reporter's Transcript ("RT") 5711-18; 3 Clerk's Transcript ("CT") 609, 614-19, 623-26, 629-30, 761-62).[1] On October 16, 2009,

_____

[1]   Petitioner was tried jointly with two co-defendants, Taurus Davon Miller and Michael Hubbard (petitioner's brother). Two juries were used: "yellow" for Hubbard, and "green" for petitioner and Miller. The same jury that convicted petitioner also found Miller guilty of one count of willful, premeditated, and deliberate first degree murder and five counts of attempted murder.
(continued...)

after denying petitioner's motion to set aside the verdict based on the insufficiency of the evidence or to strike the findings of premeditation and deliberation on the attempted murder counts, petitioner was sentenced to state prison for an indeterminate term of fifteen years to life on the murder charge and to concurrent life sentences on each of the attempted murder charges. (7 RT 6007-11; 3 CT 800-04, 808-09).

Petitioner filed a direct appeal, which was considered together with co-defendant Miller's appeal. On August 26, 2011, the California Court of Appeal affirmed both convictions in an unpublished decision. (Respondent's Notice of Lodging, Docket No. 14 ("Documents") 3-8). Petitioner and Miller both filed petitions for review in the California Supreme Court, which were summarily denied on November 30, 2011, with the following statement: "Anderson's petition for review is denied without prejudice to any relief to which petitioner may be entitled after this court decides People v. Favor, S189317." (Docket No. 14, Documents 9-11).[2]

Petitioner did not seek habeas relief in state court prior to filing a Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition" or "Pet.") herein. (Pet. at 3). Subsequently, he filed a habeas petition in the Los Angeles County Superior Court, which was summarily denied on October 22, 2012. (See Docket No. 27 at 40, Ex. A). Petitioner then filed a habeas petition in the California Court of Appeal, which was summarily denied on December 6, 2012. (See id. at 41).

---

[1](...continued)
The jury found true allegations that Miller committed the attempted murders willfully, deliberately, and with premeditation, and that Miller committed each count for the benefit of, at the direction of, or in association with a criminal street gang. Further, the jury found true allegations that Miller personally and intentionally discharged a firearm, and that a principal personally and intentionally discharged a firearm proximately causing death. (3 CT 610-13, 620-22; 7 RT 5706-11). In addition, the yellow jury convicted Hubbard of first degree murder and five counts of attempted murder. (7 RT 5704). Although petitioner's jury found true allegations against petitioner that a principal personally and intentionally discharged a firearm within the meaning of Cal. Penal Code § 12022.53, these allegations were struck by the trial court as improper in light of the jury's finding that the gang enhancements were not true as to petitioner. (7 RT 6010-11).

[2]   In People v. Favor, 54 Cal. 4th 868, 143 Cal. Rptr. 3d 659, 279 P.3d 1131 (2012), cert. denied, 133 S. Ct. 1291, 185 L. Ed. 2d 221 (2013), as is discussed in detail below, the California Supreme Court held that a trial court need only instruct a jury that attempted murder, not attempted premeditated murder, was a foreseeable consequence of the target offense in connection with aider and abettor liability.

1  Finally, petitioner filed a habeas petition in the California Supreme Court, which was summarily

2  denied on April 10, 2013.  (See id. at 42).

3       On June 12, 2012, petitioner filed his Petition herein, and consented to have the

4  undersigned Magistrate Judge conduct all further proceedings in this matter.  Respondent also

5  consented to have the undersigned Magistrate Judge conduct all further proceedings.  Following

6  an extension of time, respondent filed an Answer and Return on August 21, 2012.  (See Docket

7  No. 13).[3]  Then, following multiple extensions of time, petitioner filed his Traverse on April 29,

8  2013.  (See Docket No. 27).

9       This matter has been taken under submission, and is ready for decision.

10

11  **II.**

12  **STATEMENT OF FACTS**[4]

13  **A.    Prosecution Evidence**

14       On February 1, 2008, Rashaun Lilly was at home with her cousin George "Jack" Oates and

15  several other family members when approximately five men approached and said that they were

16  looking for Anthony Levi.  (3 RT 1849, 1855, 1917; 4 RT 2453-54).  When the men were told that

17  Levi was not there, one of the men said, "When you see Anthony, tell Anthony he needs to see

18  me."  The men left.  (3 RT 1856, 1918, 1920-21).

19

20

21      [3]    Respondent contends that portions of petitioner's Grounds Two and Four are unexhausted,

22  and asserts that the "unexhausted claims must be stricken."  (See Docket No. 13 at 14, 29-31).
    However, a federal court may deny an unexhausted claim on the merits "when it is perfectly clear

23  that the applicant does not raise even a colorable federal claim."  Cassett v. Stewart, 406 F.3d

24  614, 624 (9th Cir. 2005); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may
    be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies

25  available in the courts of the State.").  Here, to the extent that portions of petitioner's Grounds Two
    and Four may be unexhausted, the Court will exercise its discretion to deny petitioner's

26  unexhausted claims on the merits.

27      [4]    Because petitioner is challenging the sufficiency of the evidence to support his conviction,

28  the Court has independently reviewed the state court record.  See Jones v. Wood, 114 F.3d 1002,
    1008 (9th Cir. 1997).

Shortly thereafter, Levi arrived and was told that some people were looking for him.  (3 RT 1856-57, 1921-22; 4 RT 2455).  Levi indicated that he was "gonna woop [the] ass" of the person who was looking for him because the person had stolen his mother's money.  (3 RT 1923-24).

Anthony Levi, brothers Lawrence and Daveon Hart, Brian Merriweather, Jack Oates, and Lawrence's and Daveon's uncle, Christian Deshotel, then hopped over a fence and began to walk down 10th Street.  (2 RT 1592-98; 3 RT 1848-50, 1856-58, 1925, 1969-71).  Shortly thereafter, the group noticed petitioner and a girl across the street near a bus stop.  Petitioner was staring at the group or "[m]addogging" them, and Merriweather said, "What's up?"  Petitioner yelled, "This West Boulevard Mafia" or similar words; Merriweather yelled back, "This 98 Main Street Crip."  (2 RT 1597, 1599; 3 RT 1808-09, 1895-97, 1938, 1971-73; 4 RT 2129-30, 2236-39).  Merriweather stepped into the street, and the others in the group followed him.  (2 RT 1597-1600; 3 RT 1810, 1973).

Petitioner ran toward an apartment while yelling, "Hey, 'cuz. Hey, 'cuz."  (2 RT 1600-01; 3 RT 1812-13, 1899-1900, 1939, 1974-76; 4 RT 2128-30; 2 CT 486).  Petitioner hopped over a short fence into a patio or ground-level balcony area, followed by another male.  (2 RT 1603-04; 3 RT 1816-17, 1900, 1903, 1975-76).  Petitioner and the second man then went into the apartment.  (4 RT 2415, 2507-08; 2 CT 486, 493, 496).  Petitioner, Hubbard, and Miller climbed back over the balcony fence into the yard.  (3 RT 1903-04, 1944-45, 1975-77).

Merriweather and his group approached the gate to the apartment complex. Hubbard asked, "What's going on?" or "Do you want any problems?" (2 RT 1601-04; 3 RT 1817-18, 1836; 4 RT 2102-04, 2235-36).  Merriweather said, "I see you think you are hard now that your people came out.  I see you guys didn't want it" or "You want to talk mess."  (3 RT 1903-04, 1906, 1946-47; 4 RT 2235).

At some point, Lilly, who was in a car and had caught up with the group, told the group that these men were not the people who had come by earlier looking for Levi.  Deshotel, Merriweather, and the others began to walk back across the street.  (3 RT 1836, 1840-41, 1843-45, 1905-06, 1942, 1945-47; 4 RT 2104-06, 2234, 2416, 2504, 2508).  As the group was reaching the curb, petitioner, Miller, and Hubbard stood side-by-side in the yard of the apartment complex.  (2 RT

4

1607-08; 3 RT 1906-07, 1977-79; 4 RT 2416, 2461-62).  Hubbard then raised a gun and fired one shot.  (2 RT 1609; 3 RT 1906-08, 1957, 1960, 1968; 4 RT 2106-09, 2461-63, 2474, 2483, 2491). Deshotel dropped to the ground, and Lawrence Hart fell to the ground.  Everyone else in the group with Lawrence began to run.  (2 RT 1609-10; 4 RT 2108-09).  Deshotel crawled toward Lawrence and tried to shield Lawrence with his body.  (2 RT 1610, 1827).  Approximately three seconds elapsed before three to five additional shots were fired.  (2 RT 1610-11; 3 RT 1827-29, 1877-78, 1908-09, 1951; 4 RT 2109, 2418, 2433-34, 2463; 5 RT 3309, 3315-16).  Petitioner, Miller, and Hubbard fled.  (4 RT 2465; 2 CT 494, 500).

Lawrence began to cough up blood.  (2 RT 1610; 3 RT 1872, 1912).  Deshotel yelled that Lawrence had been shot.  Oates came back around the corner and helped Deshotel drag Lawrence into a nearby driveway.  (2 RT 1611-12; 3 RT 1830, 1870, 1910-11, 1953; 4 RT 2463-64).  When Lawrence's mother arrived in a car, Deshotel left.  (2 RT 1612-13, 1912-13).

Sean Garcia, who was driving down 10th Street East, testified that he saw three people running with their arms held out as if they were holding guns.  He did not see a gun, but he heard several shots.  When interviewed after the incident, he told police that the three men were standing on the corner.  (3 RT 1866-68, 1876, 1888-91; 5 RT 3375).

James Leigh, a service technician for apartment complexes in Palmdale, was doing work in the area when he heard an argument.  He then saw four men "creep along the wall" of the apartment complex and spread out along the grass area inside the fence.  Leigh heard about six gunshots.  (4 RT 2141, 2144-49).  Leigh described the shooter as wearing a black hooded sweatshirt that had gold or red writing on it.  (4 RT 2149-51).  As the shooter and his companions fled, one of them put a gun into a backpack.  (4 RT 2148-49, 2153-54).

Los Angeles County Sheriff's Deputy Daniel Welle responded to the area and saw a group of ten to fifteen people standing around a body lying on the ground.  (2 RT 1532-34).  Welle and his partner approached the person on the ground, who was Lawrence Hart, and noticed blood under his skull and torso.  (2 RT 1535).  Welle heard several people in the crowd say, "Robert did it," or "Robert and his friends did it."  People in the crowd pointed toward the apartment on the corner.  (2 RT 1536-37, 1569).  Welle and a team of Sheriff's deputies went to the apartment

indicated.  Welle knocked on the door and ordered the occupants to come out of the apartment; three adults (Elizabeth Hubbard, Valerie Hubbard, and Shaunice Dory) and two or three children exited the apartment.  (2 RT 1570-74).  Welle secured the apartment until a search warrant could be obtained.  (2 RT 1575-76).

Los Angeles County Sheriff's Sergeant Richard Biddle searched the apartment.  (5 RT 2702, 2715).  Inside a bedroom, Biddle found three .45 caliber bullets.  An empty .45 caliber ammunition magazine was found on the bed.  A pocket in a pair of jeans on the bed contained another .45 caliber round.  (5 RT 2716-17, 3343).  Biddle also found a cellular telephone with a screen that said "Taurus" and "Shamrock" and some mail in Miller's name.  (5 RT 2717).  A green notebook filled with papers was found in the living room area.  The front of the notebook had the words "Long Beach" and Hubbard's name.  (5 RT 2717-20, 3373).  Inside the notebook, several notations referred to gangs in the Long Beach area, including the 49th Street Hustler Crips, West Boulevard Crips, and Boulevard Mafia Crips. The writing in the notebook had a "gang theme regarding shooting and killing and generally the gang lifestyle."  (5 RT 2720, 3373).  Another notebook was found on the kitchen counter:  "Northside 49th Street Hustler Gangster Crip" and "Long Beach" were written on the cover of that notebook.  (5 RT 2720-21).  In one of the bedrooms, Biddle found a backpack, which had writing on it that said:  "North Side 49th Hustler Crip, Long Beach."  Pieces of paper in the backpack had the names of Hubbard and petitioner.  (5 RT 2719).

The police recovered three .45 caliber expended casings that were on the grass inside the fence of the apartment complex in the area of the shooting.  (5 RT 2704-05).  Another .45 caliber shell casing, with a case stamp that matched that of the bullets found in the apartment, was found on the curb outside the fence.  (5 RT 2706-07).  A bullet fragment was recovered from the middle of the street, and an expended bullet was found on the driveway near Lawrence Hart's body.  (5 RT 2707-09, 2723).  Another expended bullet was found in a driveway one property north of where Lawrence Hart's body was found.  The expended bullet appeared to be a .45 caliber copper-jacketed bullet.  (5 RT 2714, 2723).

The expended bullets and the casings were analyzed. (5 RT 2724). All the casings were ejected from the same firearm. (5 RT 3333). The bullet fragment was a jacket from a .45 caliber round. (5 RT 3335-37). All of the recovered expended bullets were consistent with ammunition that could be fired from a .45 caliber semi-automatic firearm. (5 RT 3342). All four cartridge cases found at the crime scene were fired from one gun. (5 RT 3360). The evidence was consistent with only one gun. (5 RT 3361).

The medical examiner determined that Lawrence was killed by a single gunshot wound to the chest. (5 RT 2764-66).

On February 8, 2008, Markese Stepney, who was in a romantic relationship with Elizabeth Hubbard at the time, received a telephone call from Elizabeth, who told him that Hubbard had shot somebody and that Miller had loaded the gun. (5 RT 2751, 2753, 2756). Elizabeth had to end the conversation because the police were at her apartment. She sounded scared. (5 RT 2753). Later, he received a telephone call from Hubbard and petitioner, both of whom asked him to "take care of their family." (5 RT 2754-55).

Elizabeth Hubbard was interviewed by the police after the shooting. (5 RT 3377-78, 3604-06; 2 CT 482-83). According to the transcript of the interview, Elizabeth said that she was in the apartment with her mother, co-defendant Hubbard, and Miller. (2 CT 484-85, 488). Elizabeth heard people outside saying, "Cuz," and Hubbard went out to the patio. Then petitioner "came in the house." (2 CT 486). At some point, petitioner went outside to the patio. (2 CT 488). Hubbard saw approximately "twelve boys" near the fence. A woman in a car told them, "[T]hat's not the boy, that's not the boy." However, the twelve people kept advancing toward petitioner. (2 CT 490). The people eventually walked away and went across the street. (2 CT 491). At some point, Miller also went outside. (2 CT 492). Miller, petitioner, and Hubbard came back inside the apartment, went into a bedroom, and then went outside again. Elizabeth heard gunshots. (2 CT 493-94). From the balcony, she saw that "all them boys" were "on the ground." (2 CT 494, 500-01). But petitioner, Miller, and Hubbard ran away after the gunshots were fired. (2 CT 494, 500). Elizabeth had not seen anyone with a gun that day, but she had seen her brothers with a gun at their apartment about four months before the shooting in this case. (2 CT 495-96, 498-500).

In February 2008, Christina Crutcher had been in a romantic relationship with Miller for three years. (4 RT 2181). During their relationship, Crutcher overheard conversations between Miller and Hubbard in which they discussed their affiliation with the 49th Hustler Crip gang in Long Beach. (4 RT 2182). Miller's moniker was "Shamrock," while Hubbard's moniker was "Stunnamic." (4 RT 2182-83).

In February 2008, Crutcher received a telephone call from Miller, who said that he was in the Palmdale/Lancaster area and was coming to Compton to see her. (4 RT 2184). Later that day, Miller, Hubbard, and petitioner showed up at her residence in Compton. (4 RT 2184-85). When he arrived, Hubbard was wearing a hat that had the letters "L.B." on it. (4 RT 2185-86). Miller told Crutcher that while he was in Palmdale, petitioner had gone to the store and ran back saying some people were trying to jump him. Hubbard grabbed a gun, and Hubbard and petitioner ran out of the apartment. Miller heard a gunshot and ran outside. When the first shot hit the victim in the head, Hubbard dropped the gun. Miller picked up the gun and fired it. Petitioner, Miller, and Hubbard then ran. Miller threw away the gun. (4 RT 2186, 2212-13, 2216-17).

Petitioner stayed with Crutcher for about two days. (4 RT 2191). After petitioner, Miller, and Hubbard left Crutcher's residence, she received a telephone call from Miller, who said that he was in Las Vegas. (4 RT 2191-93). The call became a three-way telephone conversation between Crutcher, Miller, and Rodney Dupree. (4 RT 2192). Crutcher could hear Hubbard in the background with Dupree. (4 RT 2192-93). Hubbard said that petitioner ran back to the apartment because some people were trying to jump him. Hubbard also said that he fired the first shot, which hit the victim in the head. (4 RT 2193-95, 2197-2200).

The police subsequently arrested Hubbard at Dupree's residence. (5 RT 3378). The police searched the residence and recovered a blue backpack in the living room. (5 RT 3378-79). The backpack contained a traffic citation in Hubbard's name, a green bandana, and a wallet with Hubbard's school identification card and Miller's photograph. A black hooded jacket with a yellow design was also in the backpack, along with a pair of jeans matching a description of the jeans Hubbard was wearing a short time after the shooting. A digital camera found inside the backpack contained a photograph of "a hat with an L.B." on it. (5 RT 3379-83).

8

Detective Biddle arranged for recording devices to be placed in two cells directly across from each other at the detention area of the Antelope Valley Courthouse. (5 RT 3320-21, 3383-84). Miller and petitioner were placed into one cell, and Hubbard was placed into the other cell. (5 RT 3384-85). Recordings collected of the conversations from the two cells were combined into a single recording, excerpts of which were played for each jury. (5 RT 3321-22, 3385-86, 3408; 2 CT 512).

According to the transcript of the combined recordings played for petitioner's jury, Hubbard accused Miller of "talking" to the police. (2 CT 512). Miller asked about the attempted murder charges. Petitioner explained, "Attempt is like when you attempt to try to kill them but you don't hit them hard or nothing." Miller asked why there were so many attempted murder charges, and petitioner replied; "It's only five people. And there was like -- there was way more than five people . . .." (2 CT 516). Miller also asked petitioner if Hubbard had admitted that he committed the charged crimes. (2 CT 517-18). Hubbard denied telling the police anything. (2 CT 518-19). Hubbard said that the police had told him that "[w]e know they started it." (2 CT 519). During the conversation, Hubbard repeatedly called his brother "cuz." (2 CT 516, 520, 524, 526, 530-31, 536). Petitioner also denied telling the police anything. (2 CT 520-21).

Miller admitted that he told the police that he had fired three shots. (2 CT 521). Miller told petitioner and Hubbard that the police believed that two guns had been used during the shooting. Petitioner said, "And I assume they found that shit in our house." (2 CT 522). Hubbard told his brother (petitioner), "I'm gonna handle this shit. Don't trip. I'm gonna handle this shit. If I get out, none of the niggers is coming to court." (2 CT 524). Hubbard also said that the police "really ain't got too much evidence." He added, "We could fight this shit, homie." (2 CT 524). Petitioner asked Hubbard if he should take a "deal" if one was offered. Hubbard replied, "We gonna see what they say in court." Miller said, "We'll see if they throw us a deal, then they going to want you to snitch." Petitioner responded that he would not snitch, and said, "They throw me a deal, I ain't taking no fucking deal." (2 CT 525). Hubbard said to his brother, "They want me, you or him to snitch. Or they want me and you to snitch on him. That's what the fuck they want." (2 CT 525).

1        Later, Hubbard said, "[W]e could beat this shit." He added that Miller needed to say that

2  "maybe he was faded or something and he don't know what the fuck he was talking about."

3  Hubbard added, "Like I said, they got to prove us guilty, homie." (2 CT 530). Hubbard reiterated

4  that, because Miller had already talked, Miller needed to say "he don't know what the fuck he was

5  talking about. He don't know what the fuck happened." (2 CT 530-31). Hubbard also said that

6  the police did not have enough evidence. Hubbard and petitioner both said that any gun they

7  thought the police had found in the apartment was not their gun, and Hubbard added, "Police

8  coulda laid it on the couch for all we know." (2 CT 531-32). When Hubbard asked, "what kind of

9  evidence they got," Miller said, "I'd say they got enough." (2 CT 533). Miller said that he

10  understood that the police had "like, 12 witnesses." Petitioner said he would "go in there and mad

11  dog the whole court." Petitioner added, "Snitch if you want to. Whatever. You know what

12  happens to snitches. They can come to court on me if they want to." (2 CT 533). Miller said that

13  he did not say anything about Hubbard to the police. Miller said that he had tried to lie, but the

14  police told him that his admission that he was in the apartment at the time was "enough evidence."

15  (2 CT 534). Hubbard said, "Well, we gonna have to come up with something." Miller said, "They

16  blaming us all with the same charge murder," and Hubbard said, "[b]ut they can't prove us all on

17  the same shit." (2 CT 536). Then Hubbard said to his brother (2 CT 537):

18        They going to try to find -- they probably going to try to stick somebody with the
          murder. Somebody with accessory to murder. They'll do some shit like that. Fight
19        it. Just let that shit ride, 'cuz. Let it ride. We here now. If I have to, 'cuz, I'll make
          sure you get out. If I have to, I'll make sure. … If worse come to worse, if it go all
20        bad, then it is what it is. See -- 'cause see -- it's either me and you or him.

21        In 2005, Leticia Hairston lived with Hubbard's and petitioner's older brother, Nicholas Diaz,

22  Diaz's girlfriend, Maya Alexander, and petitioner. (4 RT 2444-46, 2491-92). Shortly before

23  Hairston moved out of the apartment in November or December 2005, Hubbard's and petitioner's

24  mother, their brother, Sebastian, and their sister, Lizzie, moved into the apartment. (4 RT 2446-

25  47). At some point, petitioner yelled, "Long Beach Mafia" or "something like that" at Hairston. (4

26  RT 2447, 2494). Hairston once saw petitioner in their apartment with a gun that belonged to

27  someone else. (4 RT 2448-49, 2466-67).

28

1    Long Beach Police Detective Gary Hodgson was assigned to the Night Gang Enforcement

2    Section and was familiar with the 49th Street Hustler Crips.  (5 RT 2783-85).  The gang was

3    formed in 2004 in Long Beach.  There were five members of the 49th Street Hustler Crips on

4    record, and Hodgson had contacted three of them.  (5 RT 2785, 2805).  Hodgson had previously

5    detained Miller.  Miller said that he was an active member of the 49th Street Hustler Crips and

6    used the moniker Scorpio.  (5 RT 2786-87).  Based on Miller's admission, Hodgson believed that

7    Miller was a member of the 49th Street Hustler Crips gang.  (5 RT 2791).  Hodgson was not

8    surprised that other people knew Miller as Shamrock since gang members often give one name

9    to police and use another name with citizens or fellow gang members.  (5 RT 2787).

10   One of the notebooks recovered from Hubbard's residence appeared to have gang-related

11   writing.  (5 RT 2793-94).  In addition, the backpack recovered from Hubbard's residence also

12   contained gang writing.  (5 RT 2795-96).  Based on the backpack and notebook, Hubbard's

13   association with Miller, and Hubbard's tattoos, Hodgson believed that Hubbard was a member of

14   the 49th Street Hustler Crips gang.  (5 RT 2799-2800).

15   Hodgson testified that looking at a gang member the wrong way could result in the person

16   being killed because it was a "form of disrespect" called "maddogging."  If a gang member was

17   "maddogged," he would be "expected to do something about it" because "a lot of the gang culture

18   is about respect."  (5 RT 2798-99).  If a gang member was being challenged to fight, a response

19   would be expected.  "Depending on the severity of the disrespect," the response could include

20   fighting, using a knife, or shooting at the person.  If a gang member was challenged, he could not

21   just walk away because he would lose the respect from other members of his gang and the gang

22   would lose respect from other gangs in the area.  (5 RT 2799).

23

24   **B.    Defense Evidence**

25   Petitioner and Miller presented no evidence on their behalf.  (6 RT 3902-04).

26   Hubbard testified on his own behalf.  (6 RT 3618).  Hubbard testified that, at the time of the

27   shooting, he was at his mother's apartment in Palmdale when he heard a commotion outside and

28   saw a group of people chasing his brother, petitioner.  (6 RT 3618-19).  Hubbard "hopped over the

balcony," went outside, and walked closer to the group.  He heard people in the group chasing his brother saying, "Where are you runnin', you bitch ass nigger.  Bring your ass back here."  (6 RT 3619-21).  Hubbard asked, "What's goin' on?"  (6 RT 3621).  A vehicle drove by and someone inside said, "That's not the people. That's not the people."  The people chasing petitioner said, "So what," and "Fuck that."  (6 RT 3621, 3689).

Miller came outside and said, "They got a gun.  They got a gun."  (6 RT 3622).  Miller then handed a gun to Hubbard, who walked toward the fence near the street corner and pointed the gun in the air to scare off his brother's assailants.  (6 RT 3622-24, 3631, 3649-50, 3653-54).  Hubbard thought there were 10 to 15 people in the group.  (6 RT 3624).  The group ran off and Hubbard walked around the corner to make sure they had all left.  Hubbard was scared.  (6 RT 3624-25).  Hubbard saw one or two people turn and then the gun "went off" in his hand.  (6 RT 3626-27).  Hubbard was "surprised" and "puzzled."  He looked down and saw the gun on the ground at his feet.  (6 RT 3627).  Miller picked up the gun, and petitioner ran up to Hubbard and said, "What the fuck you just do?"  All three of them then ran away.  (6 RT 3628, 3654, 3656).  Hubbard did not remember hearing any additional shots.  (6 RT 3629, 3654).

Hubbard admitted that he was a member of the 49th Street Hustler Crips gang, and that he had tattoos to represent his connection to the gang.  (6 RT 3631-32).  Hubbard went to parties with other gang members, and they "hung out together," but he did "nothing really" as a gang member.  (6 RT 3632).  Miller also was a member of the 49th Street Hustler Crips gang, but Hubbard did not know Miller's gang moniker.  (6 RT 3637-38).

/

/

/

/

/

### III.

### PETITIONER'S CONTENTIONS

1.     Insufficient evidence supports petitioner's conviction for second degree murder and five counts of attempted murder.  (Pet. at 5, A1; Trav. at  21-25).

2.     The trial court failed to properly instruct the jury on "assault," and the cumulative instructional errors caused prejudice.  (Pet. at 5, A2; Trav. at 25-30).

3.     The trial court erred in admitting evidence of witness intimidation unconnected to petitioner.  (Pet. at 5; Trav. at 30-32).

4.     Trial counsel provided ineffective assistance of counsel in several respects.  (Pet. at 6, A4; Trav. at 8-20).

5.     Petitioner's sentence constituted cruel and unusual punishment because he was 17 at the time of the crime.  (Pet. at  6; Trav. at 32-33).

### IV.

### STANDARD OF REVIEW

The Petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA").  Pub. L. No. 104-132, 110 Stat. 1214 (1996).  Therefore, the Court applies the AEDPA in its review of this action.  See Lindh v. Murphy, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Under the AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  As explained by the Supreme Court, section 2254(d)(1) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state

1   court."  Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389  (2000).  In

2   Williams, the Court held that:

3            Under the "contrary to" clause, a federal habeas court may grant the
         writ if the state court arrives at a conclusion opposite to that reached
4        by this Court on a question of law or if the state court decides a case
         differently than this Court has on a set of materially indistinguishable
5        facts.  Under the "unreasonable application" clause, a federal habeas
         court may grant the writ if the state court identifies the correct
6        governing legal principle from this Court's decisions but unreasonably
         applies that principle to the facts of the prisoner's case.

7

8   Williams, 529 U.S. at 412-13; see Weighall v. Middle, 215 F.3d 1058, 1061-62 (9th Cir. 2000)

9   (discussing Williams).  A federal court making the "unreasonable application" inquiry asks "whether

10  the state court's application of clearly established federal law was objectively unreasonable."

11  Williams, 529 U.S. at 409; Weighall, 215 F.3d at 1062.  The Williams Court explained that "a

12  federal habeas court may not issue the writ simply because that court concludes in its independent

13  judgment that the relevant state-court decision applied clearly established federal law erroneously

14  or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411;

15  accord: Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003).  Section

16  2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings," Lindh, 521

17  U.S. at 333 n. 7, and "demands that state court decisions be given the benefit of the doubt."

18  Woodford v. Visciotti, 537 U.S. 19, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) (per curiam).  A

19  federal court may not "substitut[e] its own judgment for that of the state court, in contravention of

20  28 U.S.C. § 2254(d)."  Id.; Early v. Packer, 537 U.S. 3, 123 S.Ct. 362, 366, 154 L.Ed.2d 263

21  (2002) (per curiam) (holding that habeas relief is not proper where state court decision was only

22  "merely erroneous").

23          The only definitive source of clearly established federal law under the AEDPA is the

24  holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.

25  Williams, 529 U.S. at 412.  While circuit law may be "persuasive authority" for purposes of

26  determining whether a state court decision is an unreasonable application of Supreme Court law

27  (Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999)), only the Supreme Court's holdings

28  are binding on the state courts and only those holdings need be reasonably applied.  Williams, 529

14

1   U.S. at 412; Moses v. Payne, 555 F.3d 742, 759 (9th Cir. 2009).  Furthermore, under 28 U.S.C.

2   § 2254(e)(1), factual determinations by a state court "shall be presumed to be correct" unless the

3   petitioner rebuts the presumption "by clear and convincing evidence."

4          A federal habeas court conducting an analysis under § 2254(d) "must determine what

5   arguments or theories supported, or, [in the case of an unexplained denial on the merits], could

6   have supported, the state court's decision; and then it must ask whether it is possible fairminded

7   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

8   decision of [the Supreme Court]."  Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 786, 178

9   L.Ed.2d 624 (2011) ("A state court's determination that a claim lacks merit precludes federal

10  habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

11  decision.").  In other words, to obtain habeas relief from a federal court, "a state prisoner must

12  show that the state court's ruling on the claim being presented in federal court was so lacking in

13  justification that there was an error well understood and comprehended in existing law beyond any

14  possibility for fairminded disagreement."  Id. at 786-87.

15         The United States Supreme Court has held that "[w]here there has been one reasoned

16  state judgment rejecting a federal claim, later unexplained orders upholding that judgment or

17  rejecting the same claim rest upon the same ground."  Ylst v. Nunnemaker, 501 U.S. 797, 803,

18  111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).  Here, petitioner raised claims generally corresponding

19  to his Ground One, part of Ground Two, Ground Three, part of Ground Four, and Ground Five on

20  direct appeal.  These claims were addressed in a reasoned decision by the California Court of

21  Appeal.  (See Docket No. 14, Document 8).  The California Supreme Court subsequently

22  summarily denied the same claims when it rejected petitioner's petition for review.  Under such

23  circumstances, the Court "looks through" the California Supreme Court's unexplained denial to the

24  opinion of the California Court of Appeal as the last reasoned decision. See Ylst, 501 U.S. at 803;

25  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (district court "look[s] through"

26  to the last reasoned decision as the basis for the state court's judgment).  To the extent that

27  petitioner raised portions of his claims in his state court habeas petition to the California Supreme

28  Court, because no state court issued a reasoned decision rejecting those claims, this Court must

1    determine what arguments or theories could have supported the rejection of petitioner's claims,

2    and then assess reasonableness by asking "whether it is possible fairminded jurists could disagree

3    that those arguments or theories are inconsistent with the holding in a prior decision of [the

4    Supreme Court]." Richter, 131 S.Ct. at 786.

5

6                                         **V.**

7                              **DISCUSSION**

8    **A.**    **GROUND ONE:  SUFFICIENCY OF THE EVIDENCE**

9         Petitioner claims that insufficient evidence supports his convictions as an aider and abetter

10   because no evidence reflected that he "did anything to facilitate the crimes of murder or assault

11   with a firearm," or that he even knew that anyone was armed.  (Pet. at A1).  Petitioner contends

12   that he was only 17 at the time of the shooting, and he was confronted at a bus stop by a group

13   of "angry men" who yelled a gang name at him.  When the group "tried to attack" him, he ran

14   toward his house.  He asserts that he was "yelling for help" as they chased him.  At his house, he

15   "jumped up on the patio."  While the men "yelled" at him, petitioner's brother and his friend, who

16   had heard petitioner's "cries for help," came outside.  The group of men "continued to yell taunts

17   and threats," and co-defendant "Hubbard pulled out a gun and shot, killing one of the men."  After

18   Hubbard dropped the gun, he picked it up and shot several more times.  Petitioner asserts that

19   "Miller yelled out, 'What the fuck did you just do?" before petitioner and the others  ran away.  (Id.)

20   Petitioner further contends that the "only evidence" at trial showed that he "remained outside," that

21   his brother and Miller came outside in response to petitioner's "cries for help," and that "there was

22   never any evidence petitioner entered the apartment at all."  (Pet. at A1, Trav. at 24).  Petitioner

23   contends that he "stood by while Hubbard pulled out a gun" and fired "no more than five" shots.

24   (Pet. at A1).

25         In his Traverse, petitioner also argues that "illegally obtained and constitutionally invalid

26   evidence cannot form the foundation for a conviction," and asserts that the jury "based their

27   determination for the element of knowledge and intent soley [sic] upon the illegal and

28   unconstitutional recording."  (Trav. at 23, 24-25).

1    **1.    The opinion of the California Court of Appeal**

2    On direct appeal, the California Court of Appeal held that sufficient evidence supports the

3    jury's verdict. (Docket No. 14, Document 8 at 7-11).  The court concluded, with respect to the five

4    counts of attempted murder, that "there was sufficient evidence for the jury to find that the

5    defendants shot a 'hail of bullets' and concurrently intended to kill everyone in the crowd." (Id. at

6    24).  Further, the court concluded, in relevant part (id. at 9-10 (internal citations omitted) (footnote

7    5 added)):

8         Here, there was sufficient evidence to find [petitioner] aided and abetted the
          murder and attempted murders, or aided and abetted an assault with a deadly
9         weapon.  After [petitioner] got into a confrontation with Brian M. and his group, he
          ran home.  There was evidence from which the jury could reasonably infer that
10        [petitioner] knew Hubbard and Miller were at the apartment, and that there was a
          firearm and ammunition in the apartment.  As [petitioner] ran home, he cried out,
11        "Hey, 'cuz," in an attempt to alert someone at the apartment.  Elizabeth H. told
          police that Miller had been at the apartment for a week prior to the shooting.  In the
12        holding cell recording, [petitioner] discussed with Hubbard and Miller what police
          found at the apartment. [Petitioner] stated he "assume[d] they found that shit in our
13        house" and appeared to be referring to an ammunition clip.  The conversation
          supported the inference that [petitioner] knew there was a gun and ammunition at
14        the apartment.  In addition, Brian M. had called out a gang name, and there was
          evidence from which the jury could reasonably infer that [petitioner] knew Hubbard
15        and Miller were members of a different gang.  Based on [petitioner]'s apparent
          familiarity with gangs in the recorded holding cell conversation, and aided by the
16        gang expert's testimony, the jury could also conclude that [petitioner] knew the
          probable dynamics of a confrontation between members of different gangs.  This
17        included the likelihood that a challenge between gang members would precipitate
          a violent confrontation. [¶] Elizabeth H., Hubbard and [petitioner]'s sister, told police
18        [petitioner] went into the apartment before going back out with Hubbard and Miller,
          with Hubbard carrying a gun.[5]  An unrelated witness also saw the defendants go into
19        one of the apartments before the shooting.
               Sean G. was driving down the street where the shooting occurred, headed
20        toward the victim's group.  From the corner of his eye, he saw three people running
          single file, all with their arms extended.  When he first saw them, he assumed they
21        were playing paintball or firing [Airsoft] guns.  He then heard, but did not see, shots
          being fired, and within seconds came upon the victim, who had been shot and was
22

23   _____

24        [5]    The record reflects that Elizabeth Hubbard told the police during her interview that she did
          not see anyone with a gun during the shooting and that she did not know if her brothers had a gun
25        when they left the apartment.  However, when pressed, she said:  "They probably did but I'm not
          sure, I'm not going to say yes he had a gun but I don't know." (2 CT 494-96).  At trial, Elizabeth
26        testified that she did not see a gun during the incident. (4 RT 2506).  Further, Elizabeth denied
          telling her boyfriend, Markese, that Miller had loaded a gun and given it to Hubbard before the
27        shooting. (5 RT 2728).  At trial, however, Markese testified that Elizabeth told him this when she
          called him immediately after the shooting.  He also testified that she sounded scared in the
28        telephone call. (5 RT 2751, 2753, 2756).

1
2
3
4
5

surrounded by his companions.  Before the confrontation, Jim L. saw the three defendants "creeping" along the wall of the apartment complex heading toward the victim's group, which also suggested some form of plan.  D.H. heard [petitioner] and Hubbard both keep repeating to someone in the group, "Do you want problems, 'cuz?" [Petitioner] stood next to Hubbard and Miller as Hubbard displayed the gun, then shot Hart.  There was no evidence that [petitioner] in any way attempted to distance himself from the shootings.  After Hubbard and Miller fired the gun, [petitioner] immediately fled with them.

6

### 2.   Federal law

7    When reviewing the sufficiency of the evidence to support a conviction, a federal court must

8    determine whether, considering the record evidence in the light most favorable to the prosecution,

9    *any* rational trier of fact could have found the defendant guilty of the essential elements of the

10   crime beyond a reasonable doubt.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citing

11   Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in

12   original)); Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  In making this determination, the

13   reviewing court "must respect the province of the jury to determine the credibility of witnesses,

14   resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that

15   the jury resolved all conflicts in a manner that supports the verdict."  Maass, 45 F.3d at 1358.

16   Thus, in determining the sufficiency of the evidence to support a conviction, "the assessment of

17   the credibility of witnesses is generally beyond the scope of review."  See Schlup v. Delo, 513 U.S.

18   298, 330, 115 S. Ct. 851, 868, 130 L. Ed. 2d 808 (1995). In addition, while "mere suspicion or

19   speculation cannot be the basis for the creation of logical inferences" (see Maass, 45 F.3d at

20   1358), "circumstantial evidence can be used to prove any fact, including facts from which another

21   fact is to be inferred, and is not to be distinguished from testimonial evidence insofar as the jury's

22   fact-finding function is concerned" (see Payne, 982 F.2d at 339 (internal quotation marks

23   omitted)).  Moreover, "it is the responsibility of the jury -- not the court -- to decide what

24   conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the

25   jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have

26   agreed with the jury."  Cavazos v. Smith, __ U.S. __, 132 S. Ct. 2, 4, 181 L. Ed. 2d 311 (2011) (per

27   curiam).

28

1      Further, AEDPA requires an additional degree of deference to a state court's resolution of

2 a sufficiency of the evidence claim.  Consequently, habeas relief is not warranted unless "the state

3 court's application of the Jackson standard [was] 'objectively unreasonable.'" Juan H. v. Allen, 408

4 F.3d 1262, 1275 n.13 (9th Cir. 2005) (as amended), cert. denied, 546 U.S. 1137 (2006); see also

5 Coleman v. Johnson, __ U.S. __, 132 S. Ct. 2060, 2062, 182 L. Ed. 2d 978 (2012) (per curiam)

6 ("We have made clear that Jackson claims face a high bar in federal habeas proceedings because

7 they are subject to two layers of judicial deference.").  Finally, in adjudicating an insufficiency of

8 the evidence claim, a federal habeas court "look[s] to [state] law only to establish the elements of

9 [the crime] and then turn[s] to the federal question of whether the [state court] was objectively

10 unreasonable in concluding that sufficient evidence supported [the conviction]." See Juan H., 408

11 F.3d at 1278 n.14 (citing Jackson, 443 U.S. at 324 n.16); see also Chein v. Shumsky, 373 F.3d

12 978, 983 (9th Cir.) (en banc) ("The Jackson standard must be applied with explicit reference to the

13 substantive elements of the criminal offense as defined by state law." (internal quotation marks

14 omitted)), cert. denied, 543 U.S. 956 (2004).

15

16     **3.**    **Analysis**

17        ***a.***    ***aiding and abetting liability***

18      With respect to petitioner's conviction on the murder count, under California law, "a person

19 aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful

20 purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or

21 encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or

22 instigates the commission of the crime." People v. Hill, 17 Cal. 4th 800, 851, 72 Cal. Rptr. 2d 656,

23 952 P. 2d 673 (1998).  An aider and abettor has the requisite intent "when he or she knows the

24 full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or

25 purpose of facilitating the perpetrator's commission of the crime." People v. Beeman, 35 Cal. 3d

26 547, 560, 199 Cal. Rtpr. 60, 674 P. 2d 1318 (1984).  Moreover, "[a] person who knowingly aids

27 and abets criminal conduct is guilty of not only the intended crime … but also of any other crime

28 the perpetrator actually commits … that is a natural and probable consequence of the intended

crime." People v. Chiu, 59 Cal. 4th 155, 161, 172 Cal. Rptr. 3d 438, 325 F.3d 972 (2014) (internal quotation marks omitted); see also Beeman, 35 Cal. 3d at 560. Determination of whether an offense is a "natural and probable consequence" of the intended crime is "judged objectively." Accordingly, liability does not depend on whether the aider and abettor "actually foresaw" the consequences, but whether a "reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." Chiu, 59 Cal. 4th at 161-62 (citing People v. Medina, 46 Cal. 4th 913, 920, 95 Cal. Rptr. 3d 202, 209 P.3d 105 (2009)) (internal quotation marks omitted).

Here, petitioner's arguments are belied by the record and based on a mistaken understanding of the scope of review of an insufficiency of the evidence claim. Petitioner argues that "illegally obtained and constitutionally invalid evidence cannot form the foundation for a conviction," and asserts that the jury "based their determination for the element of knowledge and intent soley [sic] upon the illegal and unconstitutional recording." (Trav. at 23, 24-25). As the United States Supreme Court has stated, however, a "reviewing court must consider **all of the evidence admitted** by the trial court, regardless of whether that evidence was admitted erroneously." McDaniel v. Brown, 558 U.S. 120, 131, 130 S. Ct. 665, 175 L. Ed. 2d 582 (2010) (internal quotation marks omitted) (emphasis added). Accordingly, petitioner's contention, regardless of merit, that the tape recording of the conversation among the three co-defendants should not have been admitted, is irrelevant to his insufficiency of the evidence claims.

Further, petitioner's contentions that (a) "there was never any evidence petitioner entered the apartment at all" (Trav. at 24), (b) co-defendant Hubbard fired "no more than five shots," and (c) co-defendant "Miller yelled out, 'What the fuck did you just do?'" (Pet. at A1), are belied by the record. In addition, petitioner's contention that he was "confronted" by a group of "angry men" who "tried to attack" him (Pet. at A1) is unsupported by any evidence in the record. Petitioner did not testify at trial. Co-defendant Hubbard did testify, but he could not provide any evidence about the initial confrontation between petitioner and the group accompanying the victim, Lawrence Hart, because Hubbard was not present at that confrontation. The only evidence in the record concerning the initial meeting between petitioner and Lawrence's group reflects that petitioner was

"[m]addogging" the group as they walked by before any words were exchanged.  In addition, as petitioner ran away from the group toward his apartment, no evidence reflects that he ever yelled for "help," but rather, that he yelled "Hey, 'cuz."

In addition, the record reflects that one of the eye witnesses who was not connected to either the defendants or the victims testified that he in fact saw petitioner enter the apartment after jumping over the balcony railing. (4 RT 2414-15).  Moreover, petitioner's sister Elizabeth told the police during her interview the night of the shooting that petitioner entered the apartment, and also that Miller, Hubbard, and petitioner came back inside the apartment and "went into their room." (2 CT 486, 493, 496).  Although, in her testimony at trial, Elizabeth testified that petitioner was "standing outside the whole time" and denied that petitioner ever entered the apartment (4 RT 2505, 2508, 2511), it is within the province of the jury to determine the credibility of witnesses and resolve evidentiary conflicts.  Maass, 45 F.3d at 1358.

Further, the record evidence reflects that Miller admitted that he picked up the gun and fired three additional shots.  Hubbard testified that he fired one shot and dropped the gun, and that it was petitioner who asked Hubbard, "What the fuck you just do?" (6 RT 3626-28, 3654-56).  The record also reflects that multiple eye witnesses testified to hearing a single shot followed by a few seconds delay and then three to five additional shots.

The prosecutor argued that petitioner was guilty of murder as an aider and abetter. (7 RT 4508-18).  Drawing all reasonable inferences to support the jury's verdict, and viewing the evidence in the light most favorable to the prosecution, it was not unreasonable for the Court of Appeal to conclude that a rational juror could have determined beyond a reasonable doubt that petitioner knew the full extent of the criminal plan, and that he aided, promoted, or encouraged the commission of the intended crime.  As found by the Court of Appeal, the record contains evidence from which a reasonable juror could infer that petitioner knew that Hubbard and/or Miller were at his apartment as he ran toward the apartment yelling, "Hey, 'cuz."  Further, petitioner's own comments on the recording of his jail conversation with Hubbard and Miller, as well as Elizabeth's interview by the police in which she said that she had seen both petitioner and Hubbard with a gun

1    at the apartment prior to the shooting, provided sufficient evidence for a reasonable juror to infer

2    that petitioner knew that there was a firearm and ammunition at his apartment prior to the crime.

3          In addition, as the Court of Appeal concluded, evidence in the record supports a reasonable

4    inference that petitioner knew that Hubbard and Miller were members of a different gang than the

5    gang name called out to petitioner by Brian Merriweather, and that petitioner was sufficiently

6    familiar with gang dynamics to appreciate "the likelihood that a challenge between gang members

7    would precipitate a violent confrontation." (Docket No. 14, Document 8 at 9); <u>see</u>, <u>e.g.</u>, <u>People v.</u>

8    <u>Hoang</u>, 145 Cal. App. 4th 264, 275, 51 Cal. Rptr. 3d 509 (Cal.App. 4 Dist. 2006) (finding sufficient

9    evidence to support guilt as an aider and abettor to assault with a deadly weapon and its natural

10   consequence of attempted premeditated murder where defendant responded to a verbal slight to

11   his girlfriend by gang members). Finally, the evidence in the record reflects that petitioner made

12   no attempt to distance himself from the murder and attempted murders. To the contrary, petitioner

13   stood with his brother and brother's friend (and fellow gang member) during the entire shooting

14   incident, immediately fled the scene with his co-defendants, went into hiding, asked Elizabeth's

15   then-boyfriend in a telephone conversation after the shooting to "take care of [his] family" (5 RT

16   2654-55), and then, following his arrest, discussed with his co-defendants whether sufficient

17   evidence existed for a conviction, without asserting his innocence.

18          Consequently, following its independent review of the evidence before the jury, the Court

19   finds that petitioner has failed to meet his burden under the AEDPA of showing that the California

20   Court of Appeal's conclusion that a reasonable juror could have found beyond a reasonable doubt

21   that petitioner was guilty of the murder and attempted murders as an aider and abettor was

22   contrary to, or an unreasonable application of, clearly established Supreme Court law.

23

24                    **_b._**    **_attempted murder charges_**

25          With respect to the attempted murder charges, under California law, "[i]n order to prove an

26   attempted murder charge, there must be sufficient evidence of the intent to commit the murder

27   plus a direct but ineffectual act toward its commission." <u>People v. Chinchilla</u>, 52 Cal. App. 4th 683,

28   690, 60 Cal. Rptr. 2d 761 (Cal.App. 2 Dist. 1997). Generally, "[a]ttempted murder requires

1  express malice, i.e., intent to kill." People v. Stone, 46 Cal. 4th 131, 139, 92 Cal. Rptr. 3d 362,

2  205 P.3d 272 (2009).   However, the California Supreme Court also has held that:  "Where the

3  means employed to commit the crime against a primary victim create a zone of harm around that

4  victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in

5  the anticipated zone." People v. Bland, 28 Cal. 4th 313, 330, 121 Cal. Rptr. 2d 546, 48 P.3d 1107

6  (2002); People v. Vang, 87 Cal. App. 4th 554, 563-65, 104 Cal. Rptr. 2d 704 (Cal.App. 5 Dist.

7  2001) (affirming attempted murder charges as to all eleven people in the two occupied houses

8  shot at with high powered weapons even though defendants could not see all of their victims).

9        Here, to the extent that petitioner is purporting to claim that insufficient evidence supports

10 his conviction of murder and five counts of attempted murder because "no more than five" shots

11 were fired (Pet. at A1), petitioner also has failed to meet his burden under the AEDPA of showing

12 that the California Court of Appeal's conclusion that a reasonable juror could have found beyond

13 a reasonable doubt that petitioner was guilty of five counts of attempted murders was objectively

14 unreasonable.  As the Court of Appeal concluded (Docket No. 14, Document 8 at 24):

15            Here, there was sufficient evidence to support the application of a kill zone
         theory.  We disagree with [petitioner's] assertion that the evidence demonstrated
16       that a total of only four shots were fired. In fact, witnesses testified they heard
         between two and five shots being fired after the initial shot.  Thus, there was
17       sufficient evidence for the jury to find that the defendants shot a "hail of bullets" and
         concurrently intended to kill everyone in the crowd.

18

19       Here, the record reflects that the jury was instructed with CALJIC No. 8.66.1, "Attempted

20 Murder – Concurrent Intent" as follows (3 CT 717; 6 RT 3952):

21            A person who primarily intends to kill one person, may also concurrently
         intend to kill other persons within a particular zone of risk.  This zone of risk is
22       termed the "kill zone."  The intent is concurrent when the nature and scope of the
         attack, while directed at a primary victim, are such that it is reasonable to infer the
23       perpetrator intended to kill the primary victim by killing everyone in that victim's
         vicinity.
24            Whether a perpetrator actually intended to kill the victim, either as a primary
         target or as someone within a "kill zone" is an issue to be decided by you.

25

26 Construing the evidence in the record in the light most favorable to the prosecution, it cannot be

27 said that **no** rational juror could have found that petitioner was guilty of five counts of murder when

28

1   co-defendant Miller fired up to five additional shots into the dispersing crowd of at least six people

2   after Hubbard's first shot struck and killed Lawrence Hart.

3   　　　　Once again, following its independent review of the evidence, the Court finds that petitioner

4   has failed to meet his burden under the AEDPA of showing that the California Court of Appeal's

5   conclusion that a reasonable juror could have found beyond a reasonable doubt that petitioner

6   was guilty of five counts of attempted murder was contrary to, or an unreasonable application of,

7   clearly established Supreme Court law.

8   　　　　Accordingly, habeas relief is denied for Ground One.

9

10  **B.      GROUND TWO:  INSTRUCTIONAL ERROR**

11  　　　　In Ground Two, petitioner claims that the trial court failed to properly instruct the jury on

12  "assault," and that the cumulative instructional errors caused prejudice.  (Pet. at 5, A2; Trav. at 25-

13  30).  Petitioner contends that he was convicted on the theory of aiding and abetting "the target

14  crime of assault with a firearm," and the natural and probable consequence doctrine for

15  premeditated attempted murder, murder and the theory of the creation of a "kill zone."  The jury

16  was instructed with CALJIC 9.01 pertaining to aider and abetter liability for the natural and

17  probable consequence doctrine; with CALJIC 9.02 pertaining to "Assault, present ability to commit

18  injury necessary;" and "Assault with a deadly weapon," but the court did not instruct the jury on

19  the "definition of the crime of assault."  (Pet. at A2; Trav. at 26-28).  Petitioner also contends that

20  the court did not "instruct the jury that to find the defendant guilty of premeditated attempted

21  murder under the natural and probable consequences doctrine, it must find specifically that

22  premeditated murder itself [sic] had to be a natural and probable consequence of assault with a

23  firearm."  Petitioner argues that the jury was not instructed that the five counts of "premeditated

24  attempted murder must also be shown to have been a natural and probable consequence of the

25  undefined assault."  In addition, petitioner argues that the court erred by "instructing the jury with

26  CALCRIM 8.66.1 instead of CALCRIM No. 600."  Petitioner argues that the difference between

27  "zone of harm" and "zone of risk" is "significant because it permitted the jury to convict on

28  additional counts of attempted murder -- not because the shooter intended to kill additional victims

1   -- but only because he placed them in danger." (Pet. at A2; Trav. at 29-30). Finally, petitioner

2   claims that the cumulative effect of these instructional errors was prejudicial. (Pet. at 5; Trav. at

3   30).

4

5        **1.    Federal Law**

6        Initially, to the extent that any portion of petitioner's Ground Two may be premised on a

7   contention that the trial court failed to give certain jury instructions, or gave incorrect jury

8   instructions, in violation of state law, such a claim is not cognizable on federal habeas review.

9   Federal habeas review is limited to claims raised by a person in custody pursuant to the judgment

10  of a state court only on the ground that the individual is held in custody in violation of the

11  Constitution or laws or treaties of the United States. See 28 U.S.C. § 2254(a); Estelle v. McGuire,

12  502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (reiterating that "federal habeas

13  corpus relief does not lie for errors of state law"); Smith v. Phillips, 455 U.S. 209, 221, 102 S. Ct.

14  940, 71 L. Ed. 2d 78 (1982) ("A federally issued writ of habeas corpus, of course, reaches only

15  convictions obtained in violation of some provision of the United States Constitution.").

16       Rather, to merit habeas relief when an allegedly erroneous jury instruction is given, or an

17  instruction is omitted, petitioner must show that "the ailing instruction by itself so infected the entire

18  trial that the resulting conviction violated due process." Estelle, 502 U.S. at 72; Henderson v.

19  Kibbe, 431 U.S. 145, 154-55, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977); Dunckhurst v. Deeds, 859

20  F.2d 110, 114 (9th Cir. 1988). "Where the alleged error is the failure to give an instruction, the

21  burden on the petitioner is 'especially heavy.'" Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th

22  Cir. 1992) (quoting Henderson, 431 U.S. at 155). Where the claim is that the instruction was

23  ambiguous and therefore subject to an erroneous interpretation, the question is "'whether there

24  is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates

25  the Constitution." See Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380, 110

26  S. Ct. 1190, 108 L. Ed. 2d 316 (1990)). Further, the allegedly erroneous instruction(s) must be

27  considered in the context of the entire trial record and the instructions as a whole. See Estelle,

28

502 U.S. at 72; see also Cupp v. Naughten, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973).

Notwithstanding a Court of Appeal's determination of harmless error, relief is available on federal habeas review only when a constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993); see also Fry v. Pliler, 551 U.S. 112, 121, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007) (on federal habeas review, courts must assess the prejudicial impact of constitutional error in a state-court criminal trial under Brecht standard); Ayala v. Wong, __ F.3d __, 2014 WL 707162, at *13 (9th Cir. Feb. 25, 2014) (as amended) (on federal habeas review, courts "apply the Brecht test without regard for the state court's harmlessness determination"); Pulido v. Chrones, 629 F.3d 1007, 1012 (9th Cir. 2010) (same), cert. denied, 132 S. Ct. 338, 181 L. Ed. 2d 212 (2011). Claims of instructional error are subject to harmless-error analysis "so long as the error at issue does not categorically 'vitiat[e]' all the jury's findings." Hedgpeth v. Pulido, 555 U.S. 57, 61, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008) (alteration in original); see also Doe v. Busby, 661 F.3d 1001, 1021-22 (9th Cir. 2011); Clark v. Brown, 450 F.3d 898, 904 (9th Cir.) (holding that instructional error is subject to harmless error analysis), cert. denied, 549 U.S. 1027 (2006); Bradley v. Duncan, 315 F.3d 1091, 1099 (9th Cir. 2002) (holding that the failure to properly instruct the jury is a trial error subject to harmless-error analysis), cert. denied, 540 U.S. 963 (2003).

### 2. Failure to instruct on "assault"

#### a. the opinion of the California Court of Appeal

On direct appeal, the California Court of Appeal concluded that any error in failing to define assault was harmless. (Docket No. 14, Document 8 at 17). The Court of Appeal concluded that, although the trial court did not instruct the jury on the definition of assault, no prejudice resulted (id. at 20-21 (internal citations and footnote omitted)):

> Two factors in particular served to minimize the impact of the trial court's failure to define assault. First … the trial court in this case identified the alleged target offense and partially described it. The target offense identified was not simply

1      assault, but was instead assault with a deadly weapon.  This made it highly improbable that the jury would adopt a definition of assault that encompassed

2  nothing more than a noncriminal exchange of words; the assault had to be assault with a firearm.  Second, the court also gave CALJIC No. 9.01, which described the

3  necessary element of assault that the person committing the crime have the present ability to apply physical force to the person of another.  Although this instruction did

4  not completely define assault, it conflicts with [petitioner's] theory, which is that the jury could have concluded [petitioner] aided and abetted the target crime -- assault

5  -- by merely encouraging an argument between Hubbard or Miller and the crowd on the street, and nothing more.

6      Given the instructions the jury received identifying and partially describing a single target crime, there was no analytical room for the jury to engage in

7  uninformed speculation about what types of conduct were criminal and constituted the target offense.  Even without a definition of assault, we conclude it is not

8  reasonably likely that the trial court's instructions caused the jury to misapply the law.  We also find it was not reasonably probable that the trial's outcome would have

9  been different in the absence of the trial court's instructional omission.

10

11                 ***b.   analysis***

12      In evaluating an allegedly erroneous or omitted instruction, the omission must be

13  considered in the context of the entire trial record.  See Estelle, 502 U.S. at 72.  In this case, as

14  noted by the California Court of Appeal, the jury was not instructed with the definition of "assault."[6]

15  The jury, however, was instructed on "Assault with a Deadly Weapon" (6 RT 3970; 3 CT 728):[7]

16

17  _____

18      [6]  CALJIC No. 9.00 states in relevant part:  "In order to prove an assault, each of the following

19  elements must be proved:  [¶] 1.  A person willfully [and unlawfully] committed an act which by its nature would probably and directly result in the application of physical force on another person;

20  [¶] 2.  The person committing the act was aware of facts that would lead a reasonable person to realize that as a direct, natural and probable result of this act that physical force would be applied

21  to another person; and [¶] 3.  At the time the act was committed, the person committing the act had the present ability to apply physical force to the person of another. [¶] The word 'willfully'

22  means that the person committing the act did so intentionally.  However, an assault does not require an intent to cause injury to another person, or an actual awareness of the risk that injury

23  might occur to another person.  [¶]  To constitute an assault, it is not necessary that any actual injury be inflicted.  However, if an injury is inflicted it may be considered in connection with other

24  evidence in determining whether an assault was committed [and, if so, the nature of the assault]."

25  (See Docket No. 14, Document 8 at 18, n.2 (alterations in original)).

26      [7]  The record reflects that the trial court instructed the jury twice on assault with a firearm,

27  once during the bulk of the instructions and then again immediately following the prosecutor's final closing argument.  The court stated that there were two jury "instructions that should have been

28  read earlier so I'm going to read them to you now," before repeating the instruction on assault with a deadly weapon pursuant to § 245(a)(2).  (See 6 RT 3970, 7 RT 4621).

1
2
3

> Section 245(a)(2) of the Penal Code is a crime.  [¶]  Every person who commits an assault on a [sic] person of another with a firearm is guilty of a violation of section 245(a)(2) of the Penal Code, a crime.  [¶]  A firearm includes a handgun.  [¶]  In order to prove this crime, each of the following elements must be proved: [¶] One, a person was assaulted; and [¶] two, the assault was committed with a firearm.

4   The jury also was instructed with "Assault – Present Ability to Commit Injury Necessary," which

5   discusses some elements of assault, as follows (7 RT 3969; 3 CT 727):

6
7
8
9

> The [sic] necessary element of an assault is that the person committing the assault have the present ability to apply physical force to the person of another.  This means that at the time of the act which by its nature would probably and directly result in the application of physical force upon the person of another, the perpetrator of the act must have the physical means to accomplish that result.  It there is this ability, "present ability" exists even if there is no injury.

10   Further, the jury was instructed on aiding and abetting (CALJIC 3.01) and on liability for the natural

11   and probable consequences of the crimes committed by a principal (CALJIC 3.02).  (6 RT 3923-

12   24; 3 CT 667-68).   In addition, the instructions defined the "target crime" as "assault with a

13   firearm," while the crimes identified as the "natural and probable consequences" of the "target"

14   crime were defined as "murder and attempted murder."  (6 RT 3923-24; 3 CT 668).

15   　　　　In closing, the prosecutor argued that petitioner should be found guilty based on the "natural

16   and probable consequences" of aiding and abetting his brother in "assaulting somebody with a

17   firearm."  (7 RT 4521).  The prosecutor argued that, when gang members confronted another

18   group with a firearm following a verbal assault, it was reasonably foreseeable that a shooting

19   would occur, and that petitioner was guilty for this murder as was the shooter.  (7 RT 4521-22,

20   4618). The prosecutor did not argue, and no evidence in the record reflects, that the jury

21   reasonably could have found that petitioner was guilty of second degree murder as a natural and

22   probable consequence of an act of physical force apart from the assault with a deadly weapon.

23   Accordingly, in the context of the entire record, and in light of the fact that the theory presented

24   to the jury was that the murder was a natural and probable consequence of assault with a firearm,

25   on which the jury was instructed, the Court cannot find that the omission of the instruction on

26   simple assault created a reasonable likelihood that the jury applied the instructions in a way that

27   violated the United States Constitution.  As the Court of Appeal concluded, "there was no

28

1  analytical room for the jury to engage in uninformed speculation about what types of conduct were

2  criminal and constituted the target offense."  (Docket No. 14, Document 8 at 21).

3      The Court therefore finds that petitioner has failed to meet his burden of showing that the

4  California Court of Appeal's rejection of this instructional error claim was contrary to, or an

5  unreasonable application of, clearly established United States Supreme Court law.

6

7      **3.    Failure to instruct on "natural and probable consequences" for attempted**

8      **murder**

9      Petitioner contends that the trial court erred in failing to "instruct the jury that to find the

10  defendant guilty of **premeditated** attempted murder under the natural and probable consequences

11  doctrine, it must find specifically that premeditated murder itself [sic] had to be a natural and

12  probable consequence of assault with a firearm."  Petitioner argues that the jury was not instructed

13  that the five counts of "premeditated attempted murder must also be shown to have been a natural

14  and probable consequence of the undefined assault." (Pet. at A2 (emphasis added)).  He argues

15  that the "jury could have concluded that attempted unpremeditated murder was a natural and

16  probable consequence of the assault and that attempted premeditated murder was not." (Trav.

17  at 28).

18

19      ***a.    the opinion of the California Court of Appeal***

20      On direct appeal, the California Court of Appeal rejected this portion of petitioner's

21  instructional error claim, concluding that the jury was properly instructed that, under the doctrine

22  of natural and probable consequences, "it must find attempted murder was a natural and probable

23  consequence of the commission of the assault with a firearm."  No specific instruction that the jury

24  "must find premeditated attempted murder was a natural and probable consequence of the target

25  crime" was required.  (Docket No. 14, Document 8 at 21-23).

26  /

27  /

28  /

**b.    analysis**

In <u>Favor</u>, 54 Cal. 4th at 872, the California Supreme Court held that a jury "need not be instructed that premeditated attempt to murder must have been a natural and probable consequence of the target offense."[8]  In that case, a defendant was convicted under a theory of being an aider and abettor to robbery and of attempted murder as a natural and probable consequence of the robbery.  The California Supreme Court noted that "attempted premeditated murder and attempted unpremeditated murder are not separate offenses."  54 Cal. 4th at 876. Rather, under California law, the additional finding pursuant to Cal. Penal Code § 664(a) that the "attempted murder was committed willfully, deliberately and with premeditation" is "a penalty provision that prescribes an increase in punishment … for the offense of attempted murder."  54 Cal. 4th at 877.  Further, the Supreme Court noted that Penal Code § 664(a) "makes no distinction between an attempted murderer who is guilty as a direct perpetrator and an attempted murderer who is guilty as an aider and abetter and does not require personal willfulness, deliberation, and premeditation of an attempted murderer."  <u>Id.</u> (internal quotation marks omitted).  Accordingly, because Penal Code § 664(a) "requires only that the attempted murder itself was willful, deliberate, and premeditated," it is only necessary that the attempted murder be "committed by one of the perpetrators with the requisite state of mind."  54 Cal. 4th at 879 (internal quotation marks and citations omitted).  Therefore, "with respect to the natural and probable consequences doctrine as applied to the premeditation allegation under § 664(a), attempted murder -- not attempted premeditated murder -- qualifies as the nontarget *offense* to which the jury must find foreseeability."  <u>Id.</u> (emphasis in original).

Here, as in <u>Favor</u>, petitioner was found guilty of attempted murder as an aider and abetter to a target crime -- in his case, assault with a firearm.  On each count of attempted murder, petitioner's jury also found true the allegation that the attempted murder was commited willfully,

---

[8]    Although <u>Favor</u> was decided after petitioner's appeal, the Court of Appeal in petitioner's case followed the law as set forth in <u>People v. Cummins</u>, 127 Cal. App. 4th 667, 25 Cal. Rptr. 3d 860 (Cal.App. 2 Dist. 2005), and <u>People v. Lee</u>, 31 Cal. 4th 613, 3 Cal. Rptr. 3d 402, 74 P.3d 176 (2003), both of which the California Supreme Court subsequently upheld in <u>Favor</u>.  <u>See</u> <u>Favor</u>, 54 Cal. 4th at 878-79; (Docket No. 14, Document 8 at 21-23).

deliberately and with premeditation pursuant to Penal Code § 664(a).  (7 RT 5712-16; 3 CT 616-18, 623-26, 629-30).  As noted above, the jury was instructed on aiding and abetting and on liability for the natural and probable consequences of the crimes committed by a principal, where the "target" crime was defined as "assault with a firearm" and the "nontarget" crimes were defined as "murder and attempted murder."  (6 RT 3923-24; 3 CT 668).  This Court is bound by a state court's interpretation and application of California law.  See Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed.2d 407 (2005) (a federal habeas court is bound by state court interpretations of state law).  The California Supreme Court has held that a jury must only be instructed on the natural and probable consequences doctrine as applied to attempted murder and not attempted premeditated murder.  Accordingly, petitioner has failed to show any error in  the jury instructions concerning attempted murder.

### 4.    Error in instructing re "zone of risk"

Petitioner contends that the trial court erred by "instructing the jury with CALCRIM 8.66.1 instead of CALCRIM No. 600."  Petitioner argues that the difference between "zone of harm" and "zone of risk" is "significant because it permitted the jury to convict on additional counts of attempted murder -- not because the shooter intended to kill additional victims -- but only because he placed them in danger."  (Pet. at A2; Trav. at 29-30).

As noted above, the jury was instructed with CALJIC No. 8.66.1, "Attempted Murder – Concurrent Intent," which references a "zone of risk."  (6 RT 3952; 3 CT 717).  CALCRIM No. 600 provides, in relevant part (see Stone, 46 Cal. 4th at 138 n.2):

> A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or 'kill zone.'  In order to convict the defendant of the attempted murder of ___, the People must prove that the defendant not only intended to kill ___ but also either intended to kill ___, or intended to kill anyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill ___ … by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder.

In Stone, 46 Cal. 4th at 137, the California Supreme Court noted that "concurrent intent" or a "kill zone" theory is "not a legal doctrine requiring specific instructions."  Rather, it instructs the jury that they may draw the inference that "a primary intent to kill a specific target does not rule out a

concurrent intent to kill others."  As the Supreme Court further noted, because the "intent required for attempted murder is to kill rather than merely harm," language referencing a "zone of harm" is not entirely accurate, as the intent to kill is required regardless of the use of the term "harm."  See Stone, 46 Cal. 4th at 138 n.3.  Accordingly, petitioner's assertion that "zone of risk" is more permissive that "zone of harm" is not supported by the California Supreme Court.  See also People v. Bragg, 161 Cal. App. 4th 1385, 1395-96, 75 Cal. Rptr. 3d 200 (Cal.App. 3 Dist. 2008) (finding additional jury instruction that, "The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity," was not in error because the "jury also was instructed that they must find that person may *intend to kill* a specific victim or victims and at the same time *intend to kill* anyone in a particular zone of harm or kill zone") (emphasis in original, internal quotation marks omitted)).  Moreover, CALJIC No. 8.66.1 informed the jury that concurrent intent focuses on intent to kill, not just endanger, or put at "risk," the victim(s).  Finally, because California law does not require specific language concerning a "kill zone" theory of attempted murder, petitioner again has failed to show any error in the jury instructions.

### 5.   **Cumulative instructional error**

Petitioner claims that the cumulative effect of these instructional errors was prejudicial. (Pet. at 5; Trav. at 30).

"Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996)); see also Parle v. Runnels, 505 F.3d 922, 928 (9th Cir. 2007) ("[T]he Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal.").

1    Here, petitioner has failed to show multiple instructional errors occurred.  Accordingly,

2    petitioner has failed to raise even a colorable claim of constitutional error.  See Mancuso, 292 F.3d

3    at 957 ("Because there is no single constitutional error in this case, there is nothing to accumulate

4    to a level of a constitutional violation."); Davis v. Woodford, 384 F.3d 628, 654 (9th Cir. 2004)

5    (finding no cumulative error where petitioner had "not demonstrated prejudice as to the individual

6    claims"), cert. denied, 545 U.S. 1165 (2005).

7    For the foregoing reasons, habeas relief is denied for Ground Two.

8

9    **C.    GROUND THREE:  EVIDENTIARY ERROR**

10   In Ground Three, petitioner claims that the trial court erred in admitting evidence of witness

11   intimidation.  (Pet. at 5, A3; Trav. at 30-32).  Petitioner contends that the trial court allowed

12   testimony that a witness was beaten up after she was "jumped by 5 girls," and then instructed the

13   jurors that they could consider that evidence as tending to show consciousness of guilt.  This was

14   prejudicial, petitioner contends, because no evidence reflected that he "ever authorized or even

15   knew about the attack or attempted to intimidate any witness."  (Pet. at A3; Trav. at 30-32).

16

17        **1.    The record below**

18   The record reflects that witness Leticia Hairston was an older cousin to Lawrence Hart,  the

19   man killed (3 RT 1850-51; 4 RT 2451), and had once been a roommate of petitioner, his older

20   brother, Nicholas Diaz, and Diaz's girlfriend.  (4 RT 2445-46).  Hairston testified that she was

21   walking to a fast food restaurant with the father of her daughter when the younger sister of

22   Nicholas Diaz's girlfriend and four other "girls" drove by and called Hairston's name.  When

23   Hairston looked their way, the car pulled into a parking lot, and the five girls jumped out.  Before

24   the girls "jumped" her, they said, "You better not go to court," and "better not testify."  (4 RT 2496-

25   97).  In the fight, Hairston received scratches and a black eye.  Hairston testified that she called

26   Detective Biddle and also made a police report.  (4 RT 2498).  The trial court overruled objections

27   raised by counsel for petitioner and Miller and allowed the testimony as going to the credibility of

28   the witness.  (4 RT 2496-97).

1    During closing arguments, the prosecutor argued, in part, that the jury could look at the

2    attempted "intimidation of witnesses," and the testimony that Hairston "got beat up" in this case.

3    He followed this by asserting that "[t]his is common in gang cases." (6 RT 4225). The prosecutor

4    also argued that petitioner's statement in the recorded conversation with his co-defendants that

5    witnesses "better not come to court" was evidence of his guilt because, if he "didn't do anything

6    wrong, what is he worried about?" (6 RT 4225-26). In his final closing, the prosecutor referenced

7    "witness intimidation" and the evidence about a "witness getting beat up," in connection with the

8    gang evidence. (7 RT 4616).

9    The jury was instructed, in relevant part, that (6 RT 3911; 3 CT 644):

10    If you find that a defendant attempted to suppress evidence against himself in any
      manner, such as by concealing evidence, this attempt may be considered by you
11    as a circumstance tending to show a consciousness of guilt. However, this conduct
      is not sufficient by itself to prove guilt and its weight and significance, if any, are for
12    you to decide.

13

14    ## 2.    The opinion of the California Court of Appeal

15    On direct appeal, the California Court of Appeal concluded that the admission of evidence

16    of witness intimidation was harmless because "[i]n an otherwise lengthy and complex trial, Leticia

17    H's testimony about the attack was a short and minor moment." (Docket No. 14, Document 8 at

18    16). In addition, the prosecutor argued that the beating of the witness was gang related, but the

19    jury rejected the gang allegations with respect to petitioner. (Id. at 16). Further, the Court of

20    Appeal concluded (emphasis in original) (id. at 16-17):

21    [T]he jury was instructed that it should only consider an attempt to suppress
      evidence by [petitioner] as a circumstance showing consciousness of guilt *if* the jury
22    found he did in fact attempt to suppress evidence. In addition, the jury was
      instructed that attempted suppression of evidence was not enough on its own to
23    prove guilt and that it had to decide what weight and significance to give the
      evidence. It is not reasonably probable that the outcome of the trial would have
24    been different had the trial court excluded Leticia H.'s testimony about being
      attacked.

25

26    ## 3.    Analysis

27    As set forth above, federal habeas relief is not available for an alleged error in the

28    interpretation or application of state law. Rather, "[h]abeas relief is available for wrongly admitted

1  evidence only when the questioned evidence renders the trial so fundamentally unfair as to violate

2  federal due process." Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), cert. denied, 510

3  U.S. 1191 (1994); see also Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Spivey v.

4  Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999), cert. denied, 531 U.S. 995 (2000);   Jammal v. Van

5  de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) (federal habeas courts "do not review questions of

6  state evidence law").  "Only if there are no permissible inferences the jury can draw from the

7  evidence can its admission violate due process."  Jammal, 926 F.2d at 920; McKinney v. Rees,

8  993 F.2d 1378, 1384 (9th Cir.), cert. denied, 510 U.S. 1020 (1993); see also Estelle, 502 U.S. at

9  70 (where the challenged evidence is relevant to an issue in the case, its admission cannot be

10  said to have violated the defendant's due process rights).

11      To the extent that petitioner is contending that the trial court should not have admitted

12  evidence of witness intimidation as a matter of state evidentiary law, his claim is not cognizable

13  on federal habeas review.  To the extent that petitioner is purporting to claim that the admitted

14  evidence rendered his trial so fundamentally unfair as to violate due process, petitioner has failed

15  to carry his AEDPA burden of showing that the California Court of Appeal's conclusion -- that the

16  limited testimony regarding the beating of one witness "[i]n an otherwise lengthy and complex

17  trial," even if error, was harmless -- was contrary to, or an unreasonable application of, clearly

18  established Supreme Court law.  (See Docket No. 14, Document 8 at 16).  As noted by the Court

19  of Appeal, the jury was instructed that they could only consider evidence of witness intimidation

20  as tending to show a consciousness of guilt **if** they found that petitioner had attempted to suppress

21  evidence.  Here, petitioner has failed to adduce any evidence to rebut the presumption that jurors

22  followed the instructions given at trial.  See Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct.

23  727,145 L. Ed. 2d. 727 (2000); Richardson v. Marsh, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L.

24  Ed. 2d 176 (1987); Hovey v. Ayers, 458 F.3d 892, 913 (9th Cir. 2006).

25      Accordingly, the Court finds that petitioner has altogether failed to show that any error in

26  the admission of Hairston's testimony had a "substantial and injurious effect or influence in

27  determining the jury's verdict."  See Brecht, 507 U.S. at 637.  Therefore, habeas relief is denied

28  for Ground Three.

**D.     GROUND FOUR:  INEFFECTIVE ASSISTANCE OF COUNSEL**

In Ground Four, petitioner claims that trial counsel provided ineffective assistance of counsel for the following reasons (see Pet. at 6, A4; Trav. at 8-20):  (1) Counsel failed to object to the admission of evidence that petitioner had been seen three years before trial with a handgun that was owned by someone else, which evidence was used by the prosecutor to "prejudice the petitioner's jury by allowing them to infer that petitioner should have known a handgun would be at his house."  But no evidence was introduced that petitioner had owned a gun or had "even possessed [one] for more than a few moments, or that the gun ever remained at the residence." (2)  Counsel failed to object to the introduction of the recorded conversation among the three co-defendants, which was the result of petitioner, who was being housed as a minor, being placed with "adult offenders for the sole purpose of recording the conversation which would result from these people being together."  Petitioner argues that he was "in fact, coerce [sic] because of his being placed with adult offenders."  Petitioner further claims that counsel should have understood that, because he was 17, he "would simply go along with the older men's bravado with[in] the holding cell" when he was "in danger of being killed himself."  Petitioner further contends that "counsel should have protected petitioner as a minor from being housed with adult offenders."  In his Traverse, petitioner contends that counsel failed to "object to the recordings as being obtained illegally and in violation of petitioner's Fourth, Fifth, or Fourteenth Amendments [sic]."  (Trav. at 12).  (3) Counsel failed to "attack the tape," and failed to "test or obtain verification of the tapes['] authenticity and neither [sic] did trial counsel attempt in any way to show how the conversation was, in fact, not complete."  (Pet. at A4; Trav. at 9-12).

**1.     Federal law**

Petitioner's ineffective assistance of trial counsel claim is governed by a two-step analysis under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  First, petitioner must prove that his attorney's representation fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 687-88, 690.  In order to establish this, petitioner must identify the acts or omissions that rendered the representation objectively unreasonable.  Id. at

690.  Second, petitioner must show that he was prejudiced by counsel's deficient performance.  Id. at 692.  Petitioner bears the burden of establishing both components.  Id. at 687; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).

Courts generally maintain a "'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 689).  Indeed, the Supreme Court dictates that "judicial scrutiny of counsel's performance must be highly deferential."  Strickland, 466 U.S. at 689.  In order to show that his counsel performed objectively unreasonably, petitioner must overcome the strong presumption that the challenged action might be considered sound trial strategy under the circumstances.  Id.  The Court does not consider whether another lawyer with the benefit of hindsight would have acted differently than petitioner's trial counsel.  Id.  Instead, the Court looks only to whether trial counsel made errors so serious that counsel failed to function as guaranteed by the Sixth Amendment.  Id.  Moreover, in conducting this analysis, the Court must make "every effort … to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689.

Petitioner also must prove that he was prejudiced by demonstrating a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  To satisfy this requirement, petitioner must demonstrate that his counsel's error rendered the result unreliable or the trial fundamentally unfair.  Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993); Strickland, 466 U.S. at 694.  The "question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Hinton v. Alabama, __ U.S. __, 134 S. Ct. 1081, 1089, 188 L. Ed. 2d 1 (2014) (quoting Strickland, 466 U.S. at 695 (internal quotation marks omitted)).  While petitioner must prove both prongs of the Strickland test to succeed on his claim, there is no need for a court to reach both prongs of the test if the petitioner has made an insufficient showing on one.  Strickland, 466 U.S. at 697 ("there is no

reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one. … If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

In Richter, the Supreme Court reiterated that AEDPA requires an additional level of deference to a state court decision rejecting an ineffective assistance of counsel claim.  "The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard."  Richter, 131 S. Ct. at 785.  "Under § 2254(d), a habeas court must determine what arguments or theories supported or … could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786.  Thus, when Section 2254(d) applies, as it does in this case, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Id. at 788.

### 2.   **Analysis**

As set forth below, petitioner has failed to show that no reasonable argument could be made that trial counsel's performance "satisfied Strickland's deferential standard."  Accordingly, habeas relief is denied for Ground Four.

### a.   *failure to object to evidence that petitioner had been seen with a gun*

Petitioner contends that counsel was ineffective for failing to object to testimony by Hairston that petitioner had held a gun briefly in December of 2005, approximately three years before the shooting (4 RT 2446, 2448-49), and to statements by his sister Elizabeth that he had briefly possessed a gun in 2007 (5 RT 3378, 6 RT 3604; 2 CT 498-500).  (Trav. at 18-19).  The record reflects that, before a recording of the police interview of Elizabeth, counsel did join in objections and moved for a mistrial.  The objections were overruled.  (6 RT 3604-05).

In rejecting this portion of petitioner's ineffective assistance of counsel claim on direct appeal, the California Court of Appeal concluded that counsel "may have had valid tactical reasons for declining to object to Hairston's testimony concerning petitioner previously handling a gun in an attempt not to "call attention to" the evidence and give it "more importance than it deserved." (Docket No. 14, Document 8 at 13).

To the extent that petitioner contends that counsel should have raised objections to the evidence of petitioner's past handling of firearms on the grounds that it was "improper character evidence showing petitioner had the opportunity to be around people who possessed firearms" (Trav. at 19-20), petitioner is incorrect that the evidence that petitioner had been seen with a gun was relevant only for this purpose.  Although petitioner is correct that the prosecution made no attempt to show that petitioner had fired a gun, as is discussed above, the evidence that petitioner was aware that a firearm and ammunition were at his apartment was relevant to petitioner's guilt as an aider and abettor.  Petitioner has failed to show that any additional objections by his counsel to the evidence of petitioner's familiarity with guns would not have been futile.  The failure to make a futile objection does not constitute ineffective assistance of counsel.  See, e.g., James v. Borg, 24 F.3d 20, 27 (9th Cir.), cert. denied, 513 U.S. 935 (1994); Morrison v. Estelle, 981 F.2d 425, 429 (9th Cir. 1992), cert. denied, 508 U.S. 920 (1993).  Moreover, as the Court of Appeal concluded, petitioner has failed to show that counsel's failure to object to Hairston's brief testimony fell outside the wide range of reasonable professional assistance.  Because petitioner has made an insufficient showing on the deficient performance prong, there is no need for the Court to reach the prejudice prong of Strickland.  See Strickland, 466 U.S. at 697.

### b.    failure to object to the recorded conversation among the co-defendants

Petitioner contends that counsel was ineffective for failing to object to the introduction of the conversation recorded while petitioner, his brother, and his brother's friend were housed in nearby holding cells.

The record reflects that counsel for petitioner's brother objected to the introduction of the taped conversation among the co-defendants on the ground that it had no evidentiary value and

was prejudicial because of the offensive language used.  (6 RT 3691-92).  The trial court overruled the objection, finding that the tape's probative value outweighed the potential prejudice.  The trial court found that it was relevant to the gang allegations against all defendants, and it also contained talk about "how they were going to deal with the case," statements that they would "make sure that witnesses would not come to court" and how they would have to "snitch on the co-defendants," but nowhere in the tape was there any statement that the "charges were fabricated" or that any defendant was innocent.  In addition, the court stated that the "street talk" was "nothing beyond what the average person would probably hear just walking to the grocery market," and that there was nothing "there about incredible violence."  (6 RT 3692-94).

Petitioner's reliance on federal law pertaining to a coerced confession has no relevance to the circumstances of his voluntary conversation among detainees, which did not arise from any interrogation by law enforcement officers.  (Trav. at 10-11, 15).  Petitioner contends that his counsel should have objected to the introduction of the recording as a violation of state law, but he fails to cite any authority to support his position that, had counsel objected, petitioner's portion of the conversation would have been suppressed based on the "deliberate violations of petitioner's safety, as well as state law and petitioner's constitutional rights."  (Trav. at 14-15).  Petitioner has failed to show that, had counsel raised any additional objections to the introduction of the taped conversation, there is a reasonable probability that the trial court would have changed its ruling on the admissibility of the tape.  Further, although petitioner argues that this recording was "the very foundation of the case" against him (Trav. at 15) and that the "illegal recording was the basis for the jury's guilty verdict" (id. at 15-16, 18), the record does not support his contention.  Rather, petitioner's contention that, absent the recording, "[t]here remains no possible [causal] link between Miller and Hubbard's actions once outside and the necessary intent or knowledge of petitioner" (Trav. at 18), is belied by the record.  As set forth above, the evidence before the jury contains sufficient evidence for a rational juror to determine beyond a reasonable doubt that petitioner knew the full extent of the criminal plan, and that he aided, promoted, or encouraged the commission of the intended crime.  Further, even apart from petitioner's own statements in the recorded conversation, the record contains evidence in Elizabeth's taped interview with the police

from which a juror could infer that petitioner knew that there was a gun at the apartment before the shooting.

Once again, petitioner has failed to rebut the strong presumption that counsel's trial strategy fell within the "wide range of reasonable professional assistance," see Strickland, 466 U.S. at 689, and has failed to show that any additional objections by counsel to the introduction of the taped conversation among petitioner and his co-defendants would not have been futile.

### c.    failure to object to or question the authenticity of the tape

Petitioner contends that counsel was ineffective for failing to test or question the authenticity or completeness of the recording of the conversation among the co-defendants.

Petitioner, however, has altogether failed to set forth any evidence that the tape was not authentic.  Moreover, the record reflects that the jury was informed that the jail had made two recordings and that Deputy Felix combined the two recordings into one based on sounds that were common to both tapes. (5 RT 3319-22).  Detective Biddle testified that he requested Deputy Felix to make the combined tape and then he listened to that tape.  Biddle also testified that he had listened to the redacted portions of the combined recording that were to be played for both juries. (5 RT 3385-87).  Accordingly, the Court finds that, because petitioner failed to identify any acts or omissions of counsel in connection with the admission of the tape recording that fell outside the wide range of reasonable professional assistance, petitioner has failed to raise even a colorable claim that counsel's failure to object to the authenticity or completeness of the tape of the conversation among the co-defendants that was played for petitioner's jury constituted ineffective assistance of counsel.

### E.    GROUND FIVE:  CRUEL AND UNUSUAL PUNISHMENT

In Ground Five, petitioner claims that his sentence constituted cruel and unusual punishment because he was 17 at the time of the crime.  Petitioner contends that the "sentence is founded upon illegal and unconstitutional evidence" and that his "youth is a 'highly relevant' point in the constitutional analysis." (Pet. at  6; Trav. at 32-33).

41

1  The Supreme Court has held that "[a] gross disproportionality principle is applicable to

2  sentences for terms of years." Andrade, 538 U.S. at 72. The principle "does not require strict

3  proportionality between crime and sentence" but "[r]ather, it forbids only extreme sentences that

4  are 'grossly disproportionate' to the crime." Harmelin v. Michigan, 501 U.S. 957, 993, 1001, 111

5  S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring).[9]  Successful challenges based on

6  proportionality, however, are "exceedingly rare." Solem v. Helm, 463 U.S. 277, 289-90, 103 S.Ct.

7  3001, 77 L.Ed.2d 637 (1983); see also Andrade, 538 U.S. at 73 (the "precise contours" of the

8  proportionality principle "are unclear, applicable only in the 'exceedingly rare' and 'extreme' case")

9  (citation omitted).

10  In Andrade, and its companion case Ewing v. California, 538 U.S. 11, 123 S.Ct. 1179, 155

11  L.Ed.2d 108 (2003) (plurality opinion), the Supreme Court considered and rejected Eighth

12  Amendment claims concerning California's "Three Strikes" law. The Andrade petitioner had

13  received a sentence of 50 years to life for his current offenses of two counts of petty theft, where

14  the value of the stolen property totaled around $150. Due to a prior misdemeanor petty theft

15  conviction, however, both petty thefts were charged as felonies. Andrade had an extensive

16  criminal history dating back 13 years, which included three residential burglary convictions (which

17  had been charged as prior "strikes"), as well as convictions for misdemeanor theft, transportation

18  of marijuana (two times), and petty theft. In rejecting petitioner's cruel and unusual punishment

19  claim, the California Court of Appeal had concluded that the 50 years to life sentence was not

20  disproportionate. The Supreme Court held that the California Court of Appeal's decision was

21  neither contrary to nor involved an unreasonable application of the clearly established gross

22  disproportionality principle. See Andrade, 538 U.S. at 66-76.

23  In Ewing, the Supreme Court upheld a "Three Strikes" sentence of twenty-five years to life.

24  The Ewing defendant was convicted in the instant offense of stealing three golf clubs priced at a

25  total of $1,197, and had a criminal history that included numerous misdemeanor and felony

26

27  ———————————

28  [9]  Justice Kennedy's concurring opinion, which was joined by Justices O'Connor and Souter, is considered controlling. See United States v. Bland, 961 F.2d 123, 128-29 (9th Cir. 1992).

1    convictions (including three residential burglary convictions and one robbery conviction that had

2    been charged as prior "strikes") for which he had served nine separate terms of incarceration, with

3    most of his crimes being committed while on probation or parole. <u>Ewing</u>, 538 U.S. at 17-19, 30.

4    In affirming Ewing's sentence, the Supreme Court stated that it did not "sit as a 'superlegislature'

5    to second-guess [California's sentencing scheme].  It is enough that the State of California has

6    a reasonable basis for believing that dramatically enhanced sentences for habitual felons

7    'advance[s] the goals of [its] criminal justice system in any substantial way.'" (Citation omitted).

8    <u>Ewing</u>, 538 U.S. at 29-30 (alterations in original) (citing <u>Solem</u>, 463 U.S. at 297 n.22).

9           Here, in rejecting petitioner's related claim on direct appeal that counsel was ineffective for

10   failing to object to petitioner's sentence as cruel and unusual punishment, the California Court of

11   Appeal concluded that the "sentence did not constitute cruel and unusual punishment," noting that

12   "numerous courts have upheld much lengthier sentences imposed on juveniles who committed

13   murders" and that "courts have upheld lengthy sentences imposed upon defendants convicted on

14   an aiding and abetting theory." (Docket No. 14, Document 8 at 26-28).  In this case, petitioner was

15   convicted of second degree murder and five counts of attempted murder -- extremely serious

16   crimes that resulted in a death.  The offenses for which petitioner was punished are significantly

17   more serious than the corresponding triggering offenses in <u>Rummel v. Estelle</u>, 445 U.S. 263, 100

18   S.Ct. 1133, 63 L.Ed.2d 382 (1980) (obtaining $120.75 under false pretenses), <u>Andrade</u> (stealing

19   approximately $150 in videotapes from a retail store) or <u>Ewing</u> (grand theft for shoplifting three golf

20   clubs worth $399 each).  Moreover, petitioner's sentence is far less harsh than Andrade's

21   sentence, since petitioner will be eligible for parole after 15 years (whereas Andrade will not be

22   eligible for parole for 50 years).  The Ninth Circuit has stated that, "in applying [the] gross

23   disproportionality principle," "courts must objectively measure the severity of a defendant's

24   sentence in light of the crimes he committed."  <u>Norris v. Morgan</u>, 622 F.3d 1276, 1287 (9th Cir.

25   2010).  Here, petitioner's sentence does not give rise to an inference that it is grossly

26   disproportional in light of the serious nature of the crimes that he committed.  Accordingly, the

27   Court finds no need to continue with "a comparative analysis between petitioner's sentence and

28   sentences imposed for other crimes in [California] and sentences imposed for the same crime in

other jurisdictions." Harmelin, 501 U.S. at 1004; see also Ramirez v. Castro, 365 F.3d 755, 770 (9th Cir. 2004) (a comparative analysis is appropriate only in the "extremely rare case that gives rise to an inference of gross disproportionality").

The Court therefore finds that the Court of Appeal's conclusion that petitioner's sentence did not constitute cruel and unusual punishment was not contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, habeas relief is denied on Ground Five.

## F.     CERTIFICATE OF APPEALABILITY

Under Rule 11(a) of the Rules Governing § 2254 Cases, a court must grant or deny a certificate of appealability ("COA") when it denies a state habeas petition. See also 28 U.S.C. § 2253(c).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a COA. See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A COA may issue "only if . . . [there is] a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (citation omitted); see also Sassounian v. Roe, 230 F.3d 1097, 1101 (9th Cir. 2000). Thus, "[w]here a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack, 529 U.S. at 484.

The Court concludes that, for the reasons set out above, jurists of reason would not find the Court's assessment of petitioner's claims debatable or wrong. Accordingly, a certificate of appealability is **denied**. Petitioner is advised that he may not appeal the denial of a COA, but he may ask the Ninth Circuit Court of Appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

/

**VI.**

**<u>ORDER</u>**

For the foregoing reasons, IT IS HEREBY ORDERED that Judgment is entered denying and dismissing the Petition with prejudice.  A certificate of appealability is also denied.

DATED: July 28, 2014

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

45